**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOSE ALFREDO HERNANDEZ-CRUZ,

     Petitioner,

v.                                          Case No. 2:26-cv-00486-JB-LF

MARY DE ANDA-YBARRA, in her official
capacity as Field Office Director of the
Enforcement and Removal Operations, El
Paso Field Office, Immigration and Customs
Enforcement; TODD LYONS, in his official
capacity as Acting Director of the U.S.
Immigration and Customs Enforcement;
KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of
Homeland Security; PAMELA BONDI, in
her official capacity as Attorney General of
the U.S. Department of Justice; and Warden
of the Otero County Processing Center,

     Respondents.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

This matter comes before the Court on Petitioner Jose Alfredo Hernandez-Cruz's Petition

for a Writ of Habeas Corpus under 28 U.S.C. § 2241, filed February 19, 2026. Doc. 1. United

States District Judge James O. Browning referred this case to me under 28 U.S.C.

§§ 636(b)(1)(B), (b)(3), and *Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir.

1990) "to conduct hearings, if warranted, including evidentiary hearings, and to perform any

legal analysis required to recommend to the Court an ultimate disposition of the case." Doc. 5 at

1. Having reviewed the briefings and the law, and having heard the argument of counsel, I

recommend that the Court grant the petition in part.

**BACKGROUND**

Mr. Hernandez-Cruz is a Mexican citizen born in 1998. Doc. 1 at 42. Mr. Hernandez-Cruz was first brought to the United States involuntarily by his biological father (and against the wishes of his mother) in 2009, when he was about ten or eleven years old. Doc. 22 at 3, 5.[1] He "entered the United States on an unknown date without inspection" and "has resided in the United States since that time." Doc. 1 at 10. The record confirms that he first entered the United States sometime before April 9, 2018, when the Department of Homeland Security ("DHS") "charged him with being present in the United States without admission, in violation of 8 U.S.C. § 1182(a)(6)(A)(i)." *Id.* Around the same time, Mr. Hernandez-Cruz filed an application for asylum, Doc. 22 at 5, and in May 2018, he was released on bond following a custody redetermination hearing. Doc. 1 at 10–11.

On July 27, 2021, Mr. Hernandez-Cruz married a United States citizen. Doc. 20-1 at 11. His wife has two minor U.S. citizen children who live with Mr. Hernandez-Cruz and his wife, and whom he has helped raise. Doc. 1 at 6; Doc. 22 at 3; Doc. 20-1 at 10, 29–30; Doc. 20-2 at 44–49, 56. Mr. Hernandez-Cruz is the primary breadwinner for his family. Doc. 22 at 5. On October 25, 2024, an Immigration Judge ("IJ") ordered Mr. Hernandez-Cruz's removal proceedings to be administratively closed because he "is prima facie eligible for an I-601A waiver with USCIS [U.S. Citizenship and Immigration Services] as he has a USC [U.S. Citizen] wife with an approved I-130. . . . Per regulation, the respondent can only pursue an I-601A waiver if the matter is administratively closed." Doc. 2 at 38. The IJ noted that Mr. Hernandez-

---

[1] The federal respondents represented that the A-file contained an asylum application from April 2018 that stated that Mr. Hernandez-Cruz entered the United States in April 2009, when he was a child.

Cruz had some criminal history, but none of his convictions made him "per-se 'inadmissible' under INA 212a2." *Id.*

On June 25, 2025, Immigration and Customs Enforcement ("ICE") officers arrested Mr. Hernandez-Cruz in Florida while they were attempting to locate a different individual. Doc. 2 at 45. The form documenting Mr. Hernandez-Cruz's arrest noted that he had an I-485 pending when he was arrested, which is an application to adjust status (presumably based on his marriage to a U.S. citizen). *Id.* at 46. On July 22, 2025, the Department of Homeland Security moved to recalendar the administratively-closed removal proceedings against Mr. Hernandez-Cruz, which an IJ in Florida granted. *Id.* at 41. Mr. Hernandez then apparently was moved to Texas.

According to Mr. Hernandez-Cruz's current counsel, Mr. Hernandez-Cruz's previous counsel defrauded him by taking his money but failing to file all the necessary paperwork to adjust his status. Doc. 22 at 2, 4. His prior counsel also did not appear at his original bond determination hearing and he was denied bond. *Id.* at 2. He obtained new counsel—his current counsel—and he requested a bond redetermination hearing under 8 U.S.C. § 1226(a), which he received on August 28, 2025, by an IJ sitting in the El Paso SPC [Service Processing Center] Immigration Court. *Id.*; Doc. 1 at 46–47. The IJ granted bond in the amount of $2,000, Doc. 1 at 46–47, but DHS appealed, which invoked an automatic stay of the release order, *see* 8 C.F.R. § 1003.19(i)(2).[2] DHS then "challenged the Immigration Court's jurisdiction and asserted that

---

[2] Section 1003.19(i)(2) reads as follows:

> Automatic stay in certain cases. In any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more, any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR–43) with the immigration court within one business day of the order, and, except as otherwise provided in 8 CFR 1003.6(c), shall remain in abeyance pending decision of the appeal by the Board. The decision whether or not to file Form EOIR–43 is subject to the discretion of the Secretary.

Mr. Hernandez-Cruz was subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A)," and on September 8, 2025, the same IJ, following *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), determined that he lacked jurisdiction to conduct a bond redetermination hearing and revoked the prior bond. *Id.* at 11, 49.

At some point, Mr. Hernandez-Cruz was moved to New Mexico, and he currently is detained at the Otero County Processing Center in New Mexico. Doc. 1 at 11. Mr. Hernandez-Cruz requested yet another bond redetermination hearing during the brief period that the California District Court had vacated *Matter of Yajure Hurtado* but before the Ninth Circuit granted an administrative stay of the District Court's order. Doc. 22 at 2. Yet another IJ, this one sitting in the Otero Immigration Court, denied Mr. Hernandez-Cruz's request for release on bond because he believed that Mr. Hernandez-Cruz had not met his burden of showing that he is not a danger to the community. Doc. 22-1 at 1. The parties agreed, however, that nothing had changed since Mr. Hernandez-Cruz's bond redetermination hearing in August 2025; Mr. Hernandez-Cruz has been in continuous custody since that time. Doc. 22 at 2.

Mr. Hernandez-Cruz thus has remained in custody for nearly nine months, since June 25, 2025. Doc. 1 at 6. He has been separated from his U.S. citizen family members, including his

---

8 C.F.R. § 1003.19(i)(2). At least one court has held that this provision is unconstitutional. *See Herrera Torralba v. Knight*, 798 F. Supp. 3d 1184 (D. Nev. 2025) ("[T]he automatic stay regulation at [8 C.F.R.] § 1003.19(i)(2) violates procedural due process both facially and as applied, and substantive due process as applied."). Other courts have questioned the legitimacy of "[t]his heads I win, tails you lose process," which deprives noncitizens of their "due process rights and has no place in the law." *M.P.L. v. Arteta*, No. 25-CV-5307 (VSB), 2025 WL 3288354, at *11 (S.D.N.Y. Nov. 25, 2025); *see also Merchan-Pacheo v. Noem*, No. 1:25-cv-03860-SBP, 2026 WL 88526, at *15 (D. Colo. Jan. 12, 2026) (The automatic stay prevision poses a high risk of erroneous deprivation of noncitizen's rights and "inverts the traditional burdens and standards governing requests for stays pending appeal.").

4

spouse and children, for whom he was "a primary source of emotional and financial support." *Id.* He petitioned this Court for a writ of habeas corpus on February 19, 2026. *See generally id.*

This case was referred to me on February 20, 2026. Doc. 5. I ordered respondents to answer the petition. Doc. 6. Defendants Pamela Bondi, Mary de Anda-Ybarra, Todd Lyons, and Kristi Noem timely filed their response on February 27, 2026. Doc. 8.

## LEGAL STANDARD

Section 2241 of title 28 of the United States Code provides federal district courts with the power to grant writs of habeas corpus for prisoners "in custody in violation of the Constitution or laws or treaties of the United States." This provision includes jurisdiction over such petitions by noncitizens in immigration detention. *Singh v. Castro*, No. 2:26-cv-00168 JB-JFR, 2026 WL 473203, at *3 (D.N.M. Feb. 19, 2026) (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Rasul v. Bush*, 542 U.S. 466, 483–84 (2004)).

In this case, the inquiry is whether Mr. Hernandez-Cruz's detention takes place under 8 U.S.C. § 1225(b)(2)(A) or 8 U.S.C. § 1226(a). I therefore discuss the distinctions between these two frameworks briefly.

As relevant here, Section 1225 governs detention of "applicants for admission," while Section 1226 governs detention of noncitizens generally. Section 1225(a) defines an "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." Section 1225(b)(1) discusses the inspection of "arriving aliens" and "certain other

aliens,"[3] including the asylum screening process, and allows for expedited removal for those found inadmissible. Section 1225(b)(2) discusses the inspection of "other aliens"[4] (as distinct from the "certain other aliens" discussed in Section 1225(b)(1)). Section 1225(b)(2)(A), the provision at issue in this case, reads, "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added).[5] Section 1225(c) discusses the removal of inadmissible arriving aliens, while Section 1225(d) discusses the authorities of immigration officers and the Attorney General as well as the subpoena authority of the United States district courts.

Section 1226 discusses the "[a]pprehension and detention of aliens" generally, not "arriving aliens" specifically as Section 1225 does. As relevant here, Section 1226(a) states,

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) [governing "[d]etention of criminal aliens"] and pending such decision, the Attorney General–
> (1) may continue to detain the arrested alien; and
> (2) may release the alien on [bond or conditional parole].

---

[3] "Certain other aliens" include those who have not been admitted or paroled into the United States and who have not affirmatively shown their physical presence in the United States for the two continuous years preceding the date of determination of inadmissibility. *Id.* § 1225(b)(1)(A)(iii)(II). This category, as well as the "arriving alien" category, contains exceptions not relevant here.

[4] "Other aliens" includes applicants for admission who are "seeking admission" and who, by implication, are not "arriving aliens" or "certain other aliens." *See* 8 U.S.C. § 1225(b)(2). However, as discussed below, I recommend finding that this language in context refers specifically to recent arrivals at or near the border.

[5] Subparagraph B provides an exception for crewmen, arriving aliens, and stowaways, and subparagraph C provides further detail regarding "other aliens" arriving on land from foreign contiguous territories. 8 U.S.C. § 1225(b)(2)(B), (C).

8 U.S.C. § 1226(a). That is, unlike Section 1225(b)(2)(A)'s mandatory detention, Section

1226(a) allows for discretion regarding the appropriateness of continued detention. The United

States Supreme Court has summarized this statutory scheme as follows:

> In sum, U.S. immigration law authorizes the Government to detain certain aliens
> seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also
> authorizes the Government to detain certain aliens already in the country pending
> the outcome of removal proceedings under §§ 1226(a) and (c).

*Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018); *see also id.* at 303 ("As noted, § 1226 applies

to aliens already present in the United States.").

ANALYSIS

I.      **Exhaustion of Administrative Remedies**

Respondents argue that "the Petition should be dismissed for failure to exhaust

administrative remedies because Petitioner did not proceed with the custody redetermination

hearing under Section 1226 as requested." Doc. 8 at 2. Respondents do not elaborate on this

argument, and it is unclear what Mr. Hernandez-Cruz failed to do. He was granted a bond

redetermination hearing in which the immigration judge set bond at $2000, but DHS attorneys

filed an intent to file an appeal, thereby staying the case and keeping Mr. Hernandez-Cruz in

custody. Doc. 22 at 2. Trapped in limbo during the stay, he then requested another bond hearing,

where the immigration judge ruled that he lacked jurisdiction to hold a bond redetermination

hearing pursuant to *Yajure Hurtado*, and he revoked bond. *Id.*; *see also* Doc. 1 at 49. Mr.

Hernandez-Cruz appealed that ruling, and his appeal is still pending. Doc. 22 at 2. He sought yet

another bond redetermination hearing during the brief period that *Yajure Hurtado* was vacated,

but bond was denied, and the Ninth Circuit has since stayed the order vacating the *Yajure

Hurtado* decision. *Id.* Nothing in this set of facts indicates that Mr. Hernandez-Cruz was granted

a bond hearing but failed to take advantage of the opportunity; in fact, this procedural history

7

demonstrates Mr. Hernandez-Cruz's diligence in pursuing the bond he already was granted. The federal respondents agreed at the hearing that any further efforts by Mr. Hernandez-Cruz to obtain release from an IJ likely would be futile. *Id.* at 3.

To the extent Respondents argue that Mr. Hernandez-Cruz failed to appeal the immigration judge's finding that it lacked jurisdiction, I recommend that the Court find that such an attempt would be futile and therefore is not required. *See Chavez ex rel. M.C. v. N.M. Pub. Educ. Dep't*, 621 F.3d 1275, 1280 (10th Cir. 2010) ("Exhaustion of administrative remedies as a predicate for a federal-court action is not required if exhaustion would be futile or fail to provide adequate relief."). Mr. Hernandez-Cruz states in his petition that "Immigration Judges have informed class members in bond hearings that . . . [immigration judges] remain bound to follow . . . *Matter of Yajure Hurtado*" despite a district court class action invalidating it. Doc. 1 at 16–17. The overwhelming majority of district courts have not only rejected the reasoning in *Yajure Hurtado* but found it to be unlawful. *See Barco Mercado v. Francis*, — F. Supp. 3d —, 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025) (counting challenges to this practice and finding that out of at least 362 such cases, the challengers have prevailed in 350). Nonetheless, numerous cases of this nature continue to come before the Court, indicating that immigration judges continue to apply *Yajure Hurtado* in the face of widespread opposition and legal criticism. I therefore recommend that the Court find that requiring Mr. Hernandez-Cruz to appeal the immigration judge's finding that immigration courts lacked jurisdiction to hold a bond redetermination hearing would be futile.

8

## II.   Class Action

Mr. Hernandez-Cruz argues that he is part of the certified class in *Maldonado Bautista v. Santacruz*, No. 5:25-cv-01873-SSS-BFM (C.D. Cal.). In *Maldonado Bautista*, Judge Sunshine Sykes of the Central District of California certified the following class:

> All noncitizens in the United States without lawful status who (1) have entered or will enter the United States without inspection; (2) were not or will not be apprehended upon arrival; and (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the Department of Homeland Security makes an initial custody determination.

*Bautista v. Santacruz*, — F. Supp. 3d —, 2025 WL 3713987, at *2 (C.D. Cal. Dec. 18, 2025). It appears that Mr. Hernandez-Cruz belongs to this class and would be entitled to a bond hearing as a class member. S*ee Maldonado Bautista v. Noem*, 2025 WL 3678485, at *1 (C.D. Cal. Dec. 18, 2025) ("The Court . . . DECLARES that the Bond Eligible Class members are detained under 8 U.S.C. § 1226(a) and . . . are entitled to consideration for release on bond by immigration officers and, if not released, a custody redetermination hearing before an immigration judge.").[6]

> On March 6, 2026, the Ninth Circuit granted an administrative stay as follows:

> 1. The district court's December 18, 2025 declaratory judgment, D. Ct. Dkt. Nos. 93 & 94, is temporarily stayed pending a ruling on the government's emergency motion for a stay pending appeal, insofar as the district court's judgment extends beyond the Central District of California. 2. The district court's February 18, 2026 order granting petitioners' motion to enforce the judgment and vacating *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025), D. Ct. Dkt. No. 116, is temporarily stayed pending a ruling on the government's emergency motion for a stay pending appeal.

*Maldonado Bautista v. U.S. Dep't of Homeland Security*, No. 5:25-cv-01873-SSS-BFM, Doc. 129. Because the class action currently does not apply to Hernandez-Cruz because he is outside

---

[6] The respondents in the class action have appealed the decision to the Ninth Circuit and have filed a motion to stay the lower court's decision. *See Bautista v. U.S. Dept. of Homeland Security, et al.*, 9th Cir. No. 26-1044.

the Central District of California, I recommend that the Court deny relief based on his membership in the class.

## III.    Application of Statutory Law

Judge James Browning, the presiding judge assigned to this case, has established a framework for determining whether a noncitizen's detention takes place under Section 1225 and Section 1226. *Singh v. Noem*, No. 2:25-cv-01110-JB-KK, 2026 WL 146005, at *14 (D.N.M. Jan. 20, 2026); *Garcia Lopez v. Castro*, No. 2:25-cv-01144-JB-SCY, Doc. 15 at 77 (D.N.M. Feb. 25, 2026). He has found that any noncitizen who is present in the United States without having been inspected and formally admitted is an "applicant for admission" pursuant to Section 1225(a), regardless of whether they have sought formal admission at a port of entry or through channels known to the United States government, and regardless of the length of time they have lived in the United States.

Next, if the noncitizen is an applicant for admission, Judge Browning considers whether the noncitizen is subject to Section 1225(b)(1). This includes "arriving aliens" (i.e., those "in the process of inspection and arrival," *Singh*, 2026 WL 146005, at *18) and "certain other aliens" (i.e., those who have not been admitted or paroled into the United States and have *not* met the two-year continuous presence requirement discussed in Section 1225(b)(1)(A)(iii)(II) and n.1, *supra*). My understanding is that pursuant to Judge Browning's interpretation of this section of the law, all noncitizens present less than two years fall into this category. *See Garcia Lopez*, Doc. 15 at 77–79.

If the noncitizen is not subject to Section 1225(b)(1), Judge Browning looks to Section 1225(b)(2). This section applies to "other aliens" (i.e., those who are not "arriving aliens" or "certain other aliens" described above) who are *seeking admission*. "Seeking admission," in his

view, involves affirmative behavior from the noncitizen, such as seeking lawful entry at a port of entry or applying for an adjustment of status. *Singh*, 2026 WL 146005, at *21. So, if a noncitizen has been present for more than two years—such that Section 1225(b)(1) does not apply—and has engaged in affirmative behavior to seek lawful admission, Judge Browning categorizes that noncitizen as subject to Section 1225(b)(2)(A), including the mandatory detention provision, with limited exceptions not applicable here (e.g., crewmen and stowaways).

For noncitizens present for more than two years who have *not* affirmatively sought to legalize their status, Judge Browning determines that Section 1226, not Section 1225, applies. *See Garcia Lopez*, Doc. 15 at 77–79.

Mr. Hernandez-Cruz, under Judge Browning's framework, is an "applicant for admission" because he is present in the United States without having been inspected or formally admitted. He is not subject to Section 1225(b)(1) because he has been present in the United States since 2009 (i.e., more than two years). However, he had an I-485 application for adjustment of status pending at the time he was taken into custody on June 25, 2025. Doc. 1 at 44. Under Judge Browning's framework, he would qualify as "seeking admission" such that he would be subject to mandatory detention under Section 1225(b)(2)(A).

I have reviewed Judge Browning's approach thoroughly. It is noteworthy for its fidelity to the dictionary definitions of the words in the statutes. However, this literal approach fails to comply with higher courts' directive to interpret statutes as a whole rather than individual phrases in isolation, leads to anomalous results, and disregards the canon of constitutional avoidance. I discuss these concerns below and propose an alternative.

First, of course, there is the law regarding statutory interpretation. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific

11

context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–341 (1997); *see also Singh v. Noem*, 2026 WL 146005, at *7 (Browning, J.). "Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015); *see also Dekovic v. Rubio*, — F.4th —, 2026 WL 668425, at *8 (10th Cir. 2026) ("A court's duty, after all, is to construe statutes, not isolated provisions.") (internal quotation marks omitted).

Here, the statutory language is ambiguous because it can be understood by well-informed persons in different ways. *See United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002); *see also Singh v. Noem*, 2026 WL 146005, at *7 (Browning, J.). The "seeking admission" language of Section 1225 is ambiguous: one can take a literal approach, finding that an individual present in the United States without having been admitted or inspected, no matter where in the country or for how long or under what circumstances, renders himself subject to mandatory detention if he has made any attempt to obtain authorized status. Or, one can interpret the language differently: that Section 1225, in the context of Title 8, Chapter 12, Subchapter II, Part IV, refers specifically to border operations and new entrants into United States territory, while Section 1226 "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings," and Section 1225(b)(2)(A)'s reference to "seeking admission" takes place only in the context of the border or new arrivals. *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018); *see also Cortez-Gonzalez v. Noem*, — F. Supp. 3d —, 2025 WL 3485771, at *4 (D.N.M. Dec. 4, 2025) ("Noncitizens . . . who reside in the country for decades are not 'seeking admission.'"); *Salazar v. Dedos*, 2026 WL 555336, at *4–5 (D.N.M. Feb. 27, 2026). In light of

12

this ambiguity, I recommend looking to canons of statutory interpretation to guide the Court's analysis.

Supreme Court decisions spanning decades eschew a literal approach to statutory interpretation if context suggests that the dictionary or literal definition is overbroad. *See, e.g., Yates*, 574 U.S. at 538–39 (under Sarbanes-Oxley Act, a fish is not a "tangible object" despite existing in the physical world); *Andrus v. Charlestone Stone Prods. Co., Inc.*, 436 U.S. 604, 610 (1978) (under 1872 federal mining statute, water is not a "valuable mineral" despite having value and being, in a broad sense, a mineral); *McBoyle v. United States*, 283 U.S. 25, 26 (1931) (under National Motor Vehicle Theft Act, aircraft is not a motor vehicle despite meeting the definition of "self-propelled vehicle not designed for running on rails"). These cases counsel that "it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle*, 283 U.S. at 27; *see also Marinello v. United States*, 584 U.S. 1, 9 (2018) (counseling interpretive restraint to avoid unfairness and lack of fair warning); *Dubin v. United States*, 599 U.S. 110, 129–130 (2023) ("[C]rimes are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language.").

These cases look to the context of the language as well as the context of the statute as a whole to discern congressional intent. *See Yates*, 574 U.S. at 537; *Andrus*, 436 U.S. at 611; *McBoyle*, 283 U.S. at 26–27; *Robinson*, 519 U.S. at 340–41. They consider whether unusual or unexpected results will follow. *Marinello*, 584 U.S. at 10 (risk of felony prosecution for tax obstruction for a person who leaves a large cash tip in a restaurant); *Dubin*, 599 U.S. at 114 (risk of identity theft prosecution for lawyer who rounds up her billable hours); *see also Dekovic*, 2026 WL 668425, at *9–*10 (discussing three significant anomalies that would result if the court

13

interpreted an immigration provision as the Government proposed). They also consider canons of statutory interpretation. *See Yates*, 574 U.S. at 528, 543–45 (principles of *noscitur a sociis* and *ejusdem generis*). Here, I recommend considering the canon of constitutional avoidance, which I examine below.

### A. Context

In context, Section 1225(b)(2)(A) pertains to "the inspection and detention of individuals seeking admission at or near the border." *See Salazar v. Dedos*, No. 1:26-cv-00251 WJ-JHR, 2026 WL 555336, at *3 (D.N.M. Feb. 27, 2026). Section 1225's title refers to "inadmissible arriving aliens," which gives clues about Congress's intent and the scope of the section. *See Dubin*, 599 U.S. at 120–21 (statutory titles and headings are "tools available for the resolution of a doubt about the meaning of a statute," although they do not "override the plain words" of the statute's text). Looking to the text itself, much of the substance discusses inspection requirements—a process which generally occurs in the context of the border or port of entry. Other areas of immigration law contextualize inspection similarly; consider the crime of "entry without inspection" defined in 8 U.S.C. § 1325, which refers to an entrance into the United States, such as a border crossing or a plane landing, "at a time and place other than as designated by immigration officers." *See also Tanchez v. Noem*, No. 2:25-cv-01150, 2026 WL 125184, at *8. Other sections discuss stowaways, ship crew members, or noncitizens "arriving on land . . . from a foreign territory contiguous to the United States," all implicating the border itself—a stowaway discovered on a ship at an authorized port of entry, for example, or a noncitizen approaching the border on foot or by car. 8 U.S.C. § 1225(a)(2), (3); *id.* § 1225(b)(2)(B), (C); *see also Salazar*, 2026 WL 555336, at *4.

14

Even the fact that "applicant for admission" is defined in Section 1225(a)(1) to include individuals within the United States without having been admitted makes sense as applied to a person newly present within the United States—but it sounds strange when applied to a person who has been present in the United States for decades, because an "applicant" is commonly understood to be a newcomer. *Cf. Yates*, 574 U.S. at 544 ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon. But it would not be strange to refer to 'falsifying' data stored on a hard drive as simply 'falsifying' a hard drive."). And in the specific section at issue here, Section 1225(b)(2)(A) refers to the "examining immigration officer" and "seeking admission," present tense active verbs that "suggest a moment in time when a noncitizen is crossing or has recently crossed a border, not an indefinite status that applies whenever a noncitizen charged with inadmissibility encounters an immigration official." *Tanchez*, 2026 WL 125184, at *8.

Finally, the existence of Section 1226, which separately provides mechanisms for the detention of noncitizens already present in the United States and contains no language about noncitizens who have newly arrived, draws a logical contrast. The United States Supreme Court has distinguished Sections 1225 and 1226 in the following manner: "In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings*, 583 U.S. at 289. The Supreme Court's phrasing—seeking admission *into* the country—further compounds the logical inference that Section 1225 applies to new or recent entrants at or near the border, while Section 1226 applies to noncitizens who already are here.

In short, Section 1225 discusses "arriving aliens" and those present for less than two years, uses present-tense terms like "examining" and "seeking," discusses "inspection" at length (a process commonly understood to take place at the border or ports of entry), contains provisions for stowaways and crew members, and refers to "applicants" for admission—all guideposts implying, within the text of the section, that the section as a whole applies to encounters at or near the border or to noncitizens who have not been present very long. This context counsels a restrained interpretation of Section 1225(b)(2)(A)'s scope, including the phrase "seeking admission": "[t]he phrase describes a current legal posture—participation in inspection and admissibility determinations [at a moment in time close to a border crossing]—rather than a generalized or enduring objective to enter the United States." *Salazar*, 2026 WL 555336, at *4 (finding that applicant for U-visa was not "seeking admission").

## B. Overbroad and Illogical Results

Context is not the only consideration that advises against a literal approach: the results of such an approach, too, provide insight. As discussed above, courts often consider whether a particular interpretation of ambiguous language will have sweeping or unusual results, such as the risk of felony tax code prosecution for a large cash tip at a restaurant or identity theft prosecution for fudging one's billable hours. *See Marinello*, 584 U.S. at 10; *Dubin*, 599 U.S. at 114; *see also Dekovic*, 2026 WL 668425, at *9 (finding it anomalous that provision as interpreted by the Government would penalize minor children of a parent who became a naturalized U.S. citizen). Here, interpreting "seeking admission" as making any effort to obtain legal status, at any time and in any context, leads to results just as troubling. Such an interpretation means that a person who attempts to obtain authorized status through the appropriate legal channels risks a period of mandatory detention, while a person who does not disclose their undocumented status

16

or attempt to rectify it may be released on bond. No discernable heightened security risk applies to a person who self-discloses to the government in an attempt to comply with the law compared to a person who does not. If anything, the person who self-discloses likely has revealed more information about themselves to the government, facilitating a more effective bond hearing in which that person's risk of flight and danger to the community may be assessed.

Further, this disparate treatment incentivizes undocumented immigrants *not* to seek lawful status. Congress put in place mechanisms to permit noncitizens who entered without inspection to obtain legal status, recognizing the complex factors at play in these decisions. It would be illogical for Congress to impose mandatory detention on noncitizens who sought to use the very pathways Congress enacted to legitimize their status, while allowing bond hearings for noncitizens who did not; it would undermine Congress's very reasons for creating those pathways.

Notable, too, is the fact that the expansive interpretation of Section 1225(b)(2)(A) that the government now proffers is novel. From 1996, when the Illegal Immigration Reform and Immigrant Responsibility Act was enacted, until July 2025, "DHS took the position that, despite being applicants for admission, noncitizens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination." *Cortez-Gonzalez*, 2025 WL 3485771, at *5 (internal quotation marks and brackets omitted). Longstanding government practice can be a beneficial interpretive aid. *Id.* While not dispositive on its own, this inquiry into the real-world actions and consequences of the different interpretations of the statutes at issue underscores my recommendation to interpret them in a way that provides access to bond hearings and bond redetermination for noncitizens residing in the United States who have sought to legalize their status.

17

The particular case at issue demonstrates these consequences clearly. Mr. Hernandez-Cruz has attempted to legalize his status several times: first by seeking asylum in 2009, then by seeking an adjustment of status using a form I-485 (which included an I-601A provisional waiver designed for individuals already present in the country, *see* Doc. 22 at 3–4). An adjustment of status is a process by which an individual may obtain lawful permanent resident ("LPR") status from within the United States, rather than applying from outside of the United States and entering after obtaining LPR status. *See* Adjustment of Status, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, at https://www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-of-status. This procedure can apply to noncitizens with authorization (for example, a temporary visa holder who marries a United States citizen while lawfully present on that temporary visa), or it can apply to undocumented immigrants who later become eligible for LPR status if the undocumented immigrant obtains a waiver for their unauthorized entry, such as an I-601 or I-601A—the relevant pathway in Mr. Hernandez-Cruz's case. In particular, an I-601 differs from an I-601A because an I-601 requires the applicant to leave the United States to apply for lawful permanent resident status, while an I-601A allows a noncitizen with close family ties to a United States citizen or LPR to remain in the United States if it would result in extreme hardship to the citizen or LPR family member. *Beltran v. Miller*, 699 F. Supp. 3d 785, 788–89 (D. Neb. 2023); Doc. 22 at 4.

The adjustment of status and I-601A procedures contemplate that an applicant was or is unlawfully present in the United States, yet it permits the applicant a pathway to lawful permanent residence anyway. It does not make sense for individuals in such circumstances to face mandatory detention, separated from their families, when Congress has in fact provided them a pathway to remain together with their families during the application process.

Further, Mr. Hernandez-Cruz was defrauded by his first attorney, who took his money but did not file his I-601A waiver or attend his bond hearings as promised. Doc. 22 at 2, 4. Mr. Hernandez-Cruz's current attorney believes Mr. Hernandez-Cruz also may be eligible for a T-visa for victims of human trafficking and/or DACA status. But under Judge Browning's framework, seeking either of these forms of relief would subject him to mandatory detention while his request is pending, and mandatory detention would make it very difficult for him to obtain such relief. For example, to be eligible for a T-Visa, the applicant must have been a victim of a severe form of trafficking in persons and must be physically present in the United States. *See* 8 U.S.C. § 1101(T); 8 C.F.R. § 214.202. Under Judge Browning's framework, any applicant for this visa would automatically subject himself to mandatory detention, which would be a severe deterrent to seeking the relief.

Similarly, although a noncitizen who is in immigration detention may request DACA status, that status cannot be approved unless the person is released from ICE detention prior to a decision on the DACA request. 8 C.F.R. § 236.23(a)(2). In addition, USCIS currently is accepting, but is not adjudicating, initial requests for DACA because of ongoing litigation in the Southern District of Texas, *see Texas v. United States*, 691 F. Supp. 3d 763 (S.D. Tex. 2023); *see also Texas v. United States*, 126 F.4th 392 (5th Cir. 2025), which means that any application may take years to adjudicate. In essence, under Judge Browning's framework, a DACA applicant in immigration detention could never obtain the relief to which the person might otherwise be entitled.

To classify Mr. Hernandez-Cruz as "seeking admission" and, because of that status, detain him so that he is severely hampered in obtaining admission is illogical. Congress and the Executive Branch have created multiple pathways through which Mr. Hernandez-Cruz can

19

pursue legal status—adjustment of status, a T-visa, DACA status—but a literal interpretation of Section 1225 forecloses or severely narrows all these pathways because pursuing this relief automatically subjects him to mandatory detention. Such an interpretation severely discourages a noncitizen present for more than two years to pursue an adjustment of status, a T-visa, or DACA status if he is eligible. This is an absurd result that turns several of Congress and the Executive Branch's carefully calculated pathways to lawful residence into unattainable illusions. Even if Judge Browning is not inclined to alter his interpretive framework generally, I recommend that he alter his approach in this case because of the absurdity of these results as applied to Mr. Hernandez-Cruz in particular.

## C. Canon of Constitutional Avoidance

Finally, reading the term "seeking admission" to include any attempts to obtain authorized status violates the canon of constitutional avoidance. The canon of constitutional avoidance provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1249 (10th Cir. 2008). Here, an expansive interpretation of "seeking admission" causes constitutional problems because noncitizens possess Fifth Amendment due process rights in the context of removal proceedings. *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025); *see also Tanchez*, 2026 WL 125884, at *14–16; *Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 107 (2020) (([A]liens who have established connections in this country have due process rights in deportation proceedings."). "Due process is flexible" and situational, *Jennings*, 583 U.S. at 314, and because of the complexities of each situation, generalized rules may be inapposite, *Velasquez Salazar v. Dedos*, 806 F. Supp. 3d 1231, 1245 (D.N.M. 2025). But in cases of

20

mandatory detention without bond, the Fifth Amendment implications are highly serious. *See German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 209–11 (3d Cir. 2020) (holding that noncitizens can bring as-applied challenges to detention under Section 1226(c) based on due process); *Reid v. Donelan*, 17 F.4th 1, 7 (1st Cir. 2021) (due process clause imposes reasonableness limitation on Section 1226(c) detention). A narrow interpretation, limiting "seeking admission" to the context of new entrants near the border, significantly diminishes the grave constitutional questions to which mandatory detention gives rise.

## D. Vagueness and Fairness

The cases cited above counsel that "it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle*, 283 U.S. at 27; *see also Marinello*, 584 U.S. at 9; *Dubin*, 599 U.S. at 129–30. The United States Supreme Court has ruled that "the most exacting vagueness standard should apply in removal cases." *Sessions v. Dimaya*, 584 U.S. 148, 146 (2018). Although removal cases are not criminal in nature, deportation is "a drastic measure, often amounting to lifelong banishment or exile." *Id.* at 157 (internal quotation marks omitted). Indeed, the Supreme Court applied the void-for-vagueness doctrine in a removal case to determine that "crime of violence" was too vague a term to serve as a basis for removal. *See generally id.*

I do not argue that Section 1225(b)(2)(A) should be struck down as void for vagueness, as the void-for-vagueness doctrine "operates in much reduced force outside of its core area of application, criminal law," and this case, unlike *Dimaya*, does not involve crimes in any way. *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1170 (D.N.M. 2014) (Browning, J.). I merely observe that the underlying legal principles—the importance of giving fair warning to individuals, including

21

noncitizens, about the consequences of their conduct—counsel against mandatory detention for noncitizens who have sought to obtain legal status. Such a bait-and-switch, providing a pathway for noncitizens to adjust their status but arresting them and subjecting them to mandatory detention when they try, flies afoul of fundamental fairness considerations, and the language of the statute does not provide adequate warning that "seeking admission" is such an expansive and dangerous term.

### E.  Conclusion

For the reasons discussed above, I recommend that the Court find that a literal reading of the language in Section 1225(b)(2)(A), including "seeking admission," is legally incorrect. "Seeking admission" must be read in its context: it pertains to individuals who seek admission upon entry at or near a border or port of entry, not those who seek to obtain authorized status years or decades later. Accordingly, Mr. Hernandez-Cruz's Application for Cancellation of Removal and Adjustment of Status, which was received by the EOIR on October 1, 2025, when he already had lived in the United States for at least 15 years, does not constitute "seeking admission" and therefore does not subject him to mandatory detention under Section 1225(b)(2)(A). Rather, Section 1226 governs his detention, and he is entitled to a bond hearing.

Because Mr. Hernandez-Cruz already received a bond hearing, I recommend that the Court order his $2000 bond reinstated and that he be released as soon as he posts bond. In the alternative, I recommend that the Court order Respondents to provide Mr. Hernandez-Cruz a bond hearing under Section 1226(a) within seven days of the Court's order. I recommend that the Court order that the government must prove by clear and convincing evidence that Mr. Hernandez-Cruz is either a flight risk or a danger to the community, as his first bond hearing found him to be neither, and nothing has changed since that initial determination except the

22

immigration judge who made the ruling.[7] *See Velasquez Salazar v. Dedos*, 806 F. Supp. 3d 1231, 1244–45 (D.N.M. 2025). If Mr. Hernandez-Cruz is not afforded a bond hearing within that time, I recommend that the Court order his immediate release.

## IV.    Attorney's Fees

Mr. Hernandez-Cruz requests attorney's fees and costs under the Equal Access to Justice Act ("EAJA"). Doc. 1 at 28. However, because Mr. Hernandez-Cruz originally proceeded pro se and pro se litigants may not collect attorney fees under the EAJA, I recommend that the Court deny this request. *See Demarest v. Manspeaker*, 948 F.2d 655, 655–56 (10th Cir. 1991).

## CONCLUSION

I recommend that the Court grant in part and deny in part Mr. Hernandez-Cruz's petition for habeas corpus.

I recommend that the Court grant his petition as it pertains to bond. Because Mr. Hernandez-Cruz already received a bond hearing, I recommend that the Court order his $2000 bond reinstated and that he be released as soon as he posts bond. In the alternative, I recommend that the Court order Respondents to provide Mr. Hernandez-Cruz a bond hearing under Section 1226(a) within seven days of the Court's order with the burden on the government to prove by clear and convincing evidence that Mr. Hernandez-Cruz is a flight risk or a danger to the

---

[7] I pause to note my serious concerns that immigration judges may not be providing due process as required by law. During the hearing, counsel for Mr. Hernandez-Cruz discussed her knowledge of approximately 110 former immigration judges who believe they were terminated by this administration for issuing rulings unfavorable to the government. Doc. 22 at 3. Additionally, the Department of Homeland Security website currently states the following: "Help write the next chapter of America. Apply today to become a deportation judge and define America for generations." *See* Attached. Advertising for "deportation judge" positions, rather than "immigration judge" positions, heavily suggests that immigration judges are being pressured to deport individuals rather than to rule fairly according to established legal standards.

community. If Mr. Hernandez-Cruz is not afforded a bond hearing within that time, I recommend that the Court order his immediate release.

I recommend that the Court deny the petition as it pertains to EAJA fees.

Finally, because Mr. Hernandez-Cruz's motion for temporary restraining order (Doc. 2) requests release on the bond previously ordered by the IJ on August 28, 2025, which aligns with my recommendation, I also recommend granting the TRO. Doc. 2.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, **73 F.3d 1057, 1060 (10th Cir. 1996). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court.** *Id.* **In other words, if no objections are filed, no appellate review will be allowed.**

LAURA FASHING
UNITED STATES MAGISTRATE JUDGE



## You Be the Judge

Help write the next chapter of America. Apply today to become a deportation judge and define America for generations.

**Define America for Generations**

From www.dhs.gov (last visited 3/13/2026).